IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Christiana Juaire, | ) | Case 4:09-cv-709-TLW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **FINDINGS OF FACT,** |
| | ) | **CONCLUSIONS OF LAW, AND** |
| United States of America, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter comes before the Court following a bench trial held on September 6-8, 2011. Having considered the testimony of the witnesses, both in court and by way of deposition, the exhibits, and arguments of counsel, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

## BACKGROUND

This tort claim involves disputed facts as to whether the mirror on a rural mail carrier's Chevy Blazer hit a flagger directing traffic on North Pamplico Highway at Hillside Drive in Florence County. The alleged incident occurred on October 12, 2006, at approximately 3:00 p.m. Plaintiff, Christiana Juaire, was flagging traffic in her position as a Trade Specialist II for the South Carolina Department of Transportation. Plaintiff claims that a rural mail carrier driving a 2002 Chevy Blazer, which had been modified as a right-hand-drive vehicle, struck her in the mid back region with the vehicle's left side mirror. Thereafter, on March 19, 2009, Plaintiff filed the instant personal injury action pursuant to the Federal Tort Claims Act 28 U.S.C. §§ 2671 et seq. and 28 U.S.C. § 1346(b).

# FINDINGS OF FACT[1]

**A.    The Parties**

1.    The Plaintiff, Christiana Juaire, is a resident and citizen of the County of Florence, State of
      South Carolina.

2.    The Defendant is the United States Government.

3.    This is an action arising under the Federal Tort Claims Act, 28 U.S.C. §§2671 et. seq. This
      court is vested with jurisdiction pursuant to 28 U.S.C. §1346(b).

**B.    The Incident:**

4.    On October 12, 2006, Plaintiff was employed by the South Carolina Department of
      Transportation as a Trade Specialist II, whose duties included flagging traffic in the
      Department's work zones. C. Juaire Trial Test.  Plaintiff had been employed in this position
      for just over a year.  G. George Trial Test.  On that day, she was flagging and stopping traffic
      for a work zone located on the Pamplico Highway in Florence County, South Carolina. C.
      Juaire Trial Test.  Relevant to this incident, the Department of Transportation had the
      northbound lane of the Highway closed.  Id. To close that lane, Plaintiff testified she used
      her stop sign and had the lane of traffic stopped and initially was facing sideways (looking
      at the highway with her back to the shoulder of the road).  Id.  At the time of the accident,
      she testified that she had her back more to her traffic as she was looking back and forth
      between her stopped traffic and any traffic coming from the other direction. Id.  Plaintiff
      identified Plaintiff's Exhibit # 34 as showing where she was standing relevant to the highway
      when she was hit.  Id.  This photograph shows Plaintiff standing on the shoulder of the

---

[1]The Court makes the enumerated findings of fact by a preponderance of the evidence.

2

roadway.  <u>Id</u>. The shoulder of the road is an appropriate place to stand when flagging.  Rouse Trial Test.; Bostick Trial Test.

5.    Donald Singletary (hereinafter "Singletary")  is a United States Postal Service rural mail carrier (now retired) then working out of the Pamplico Post Office. D. Singletary Trial Test. Singletary testified that, on October 12, 2006, he was delivering mail in his 2002 Blazer, which he had modified into a right-hand-drive vehicle.  <u>Id</u>.  He delivered mail to three mailboxes on North Pamplico Highway and needed to turn right onto Hillside Drive to deliver to four mailboxes there.  <u>Id</u>.  While the traffic was stopped, Singletary, delivering mail for the United States Postal Service, drove on the shoulder of the road to turn right on Hillside Drive.  <u>Id</u>.  Singletary's vehicle including the mirror on the side was a total of 73 inches.  N. Yarborough Trial Test.  Based on photographs of the area that were placed into evidence, the shoulder of the road  was not much wider than the vehicle driven by Singletary. Def. Ex. # 13, # 14.  Singletary drove on the shoulder of the road to turn right onto Hillside Drive despite the "Stop" sign which was displayed to Singletary's line of traffic.   D. Singletary Trial Test.  This decision by him posed a danger to the Plaintiff.  After making his deliveries in this area, Singletary had to drive through a line of cones to reenter the highway. Id.

6.    Singletary testified that on occasion, he got too close to a mailbox and his mirror "rubbed" it, which caused the mirror to collapse.  D. Singletary Trial Test.

7.    Plaintiff's counsel in opening statement represented without objection that the parties stipulated that the side mirror is located 46 inches from the ground.   Plaintiff was hit on her mid back, approximately 46 inches from the ground. C. Juaire Trial Test.

8.     The Plaintiff testified that she was struck by the mirror on the postal vehicle. She stated that the impact of the mirror "knocked" her around, but did not knock her down. C. Juaire Trial Test.

9.     Plaintiff reported that the postal vehicle hit her to the other flagman on the job, Elease "Dixie" Rouse, to her supervisor, Danny Bostick, and to other members of her crew. C. Juaire Trial Test.; Rouse Trial Test.; D. Bostick Trial Test.; C. McKnight Trial Test. "Dixie" Rouse, the other flagger on the day of the incident, testified that Plaintiff came on the radio and said "that damn mailman hit me." Rouse Trial Test. Rouse "hollered" that Plaintiff had been hit by the mailman to get other workers' attention. Id. Danny Bostick asked Ben Durant to walk down and check on Plaintiff. D. Bostick Trial Test. Durant testified that Plaintiff said that "the mailman just scared the heck out of [me]," but that she was alright. Durant Trial Test. Shortly thereafter, Bostick himself walked down to where Plaintiff was located. D. Bostick Trial Test. Bostick testified that when he asked Plaintiff what happened, she said the mailman hit her in the back with his vehicle's mirror, but she said she was OK. Id. Clayton McKnight also went to check on Plaintiff and testified that she said "the damn mailman hit me," but that she was OK. C. McKnight Trial Test. Plaintiff's supervisor, Bostick, in turn reported the incident to the District Maintenance Engineer ("DME"). D. Bostick Trial Test.; G. George Trial Test. In turn, the DME, Ray George, relayed this information to the Postmistress at the Pamplico Post Office.

10.     After the incident, Plaintiff continued on with her workday. C. Juaire Trial Test. She declined offers of assistance or to relinquish her flag. D. Bostick Trial Test.

11. Although Singletary denies that his mirror made contact with Plaintiff, the Court concludes based on the evidence presented (and summarized herein) and the Court's evaluation of the same, that Plaintiff was struck in the mid back region with the vehicle's left side mirror. Notably, although no one else witnessed first hand these events, the Court finds that Plaintiff's allegations are corroborated by the subsequent happenings as reported by her co-workers and the medical evidence, which are consistent with her version of the incident. Accordingly, in weighing the credibility of the two accounts of this incident, the Court is persuaded that Plaintiff was struck in the mid back region by the postal vehicle's left side view mirror.

12. After completing her shift on October 12, 2006, later in the evening, Plaintiff went to the emergency room at Carolinas Hospital System with complaints of back pain. C. Juaire Trial Test. Notably, she was diagnosed with a back contusion. Def. Ex. # 18, p. 108. No emergency room doctors testified. The emergency room records with a diagnosis of contusion do support a finding that Plaintiff was struck by the mail truck's mirror, although no significant physical injury was diagnosed at that time. X-rays were taken and the following notation recorded: "[f]rontal and oblique views of the left ribs reveal no evidence of bony injury. Soft tissues are un remarkable. Small granuloma is noted in the right lung. The left lung is well inflated. IMPRESSION: NO ACUTE FINDINGS." Def. Ex. # 18, pps. 108, 114. The emergency room discharge forms indicate that she could return to work on October 14, 2006, with no restrictions. Def. Ex. # 18, p. 117. Discharge Instructions from the Carolinas Hospital Occupational Health Center, dated October 16, 2006, indicate that Plaintiff can return to desk work only. Def. Ex. # 23, p. 12-13.

13.     Since the incident, Plaintiff has been treated by a series of doctors, including <u>inter alia</u>, Dr.

Joslyn Angus, Dr. Dewey Ervin, Dr. William Naso, Dr. Joseph Healey; Dr. Robert Turner,

a rheumatolgist; Dr. Ezra Riber, a pain specialist; and Dr. Larry Bergman, a psychotherapist.

C. Juaire Depo.

14.     Dr. Robert Turner, a rheumatologist in Florence, South Carolina, referred Ms. Juaire to Dr.

Riber, a pain management specialist.   Riber Video deposition. Dr. Riber began seeing

Plaintiff on February 20, 2008 and initially diagnosed that she had a facet syndrome injury.

<u>Id</u>.  He opined to a reasonable degree of medical certainty that the trauma which Plaintiff

asserted occurred, that is being struck in the back by the side view mirror of a postal vehicle,

was the probable cause of her facet syndrome injury and the complaints of pain she was

experiencing.  <u>Id</u>.  The Court finds this opinion persuasive.  Dr. Riber tried certain injection

treatments including an epidural and bilateral facet injections, with little benefit.   <u>Id</u>.

15.     Ultimately, Dr. Riber treated Plaintiff by having a spinal cord stimulator implanted into her

back.[2]  Riber Video deposition.  He testified that the implant was used as a last resort.   <u>Id</u>.

He testified that before a spinal cord stimulator is permanently implanted in a patient, a

"trial" is done.  <u>Id</u>.  According to Dr. Riber, "[i]f [the spinal cord stimulator] covers up their

pain beautifully, then we recommend they go on and have a permanent implant.  If it doesn't

work well, we do not encourage that implant." <u>Id</u>.  Plaintiff went through the trial period

successfully, and Dr. Riber recommended that she have the permanent implantation.  <u>Id</u>.

---

[2]Dr. Rakesh Chokski at Pee Dee Orthopedics actually did the implantation procedure on November 4, 2008.  Riber Video Depo.; Defendant's Exhibit # 19, p. 129.

16. After implantation, Dr. Riber concluded that Plaintiff was "better" and "improved." Riber Video deposition. He opines that her facet syndrome is permanent in nature and that Plaintiff has probably reached maximum medical improvement. Id. His prognosis for Plaintiff is that "she will maintain a reasonable level of functioning that she has now. We will do everything with medication adjustments, having the stimulator checked from time to time, replacing the battery as need be. It's – it's all a matter of just fine tuning. So I'm – I'm hoping she'll stay as well as she is. She's –she's not expected to improve past where she is and I hope we'll be able to prevent her from regression." Id.

17. Dr. Riber, and others, also prescribed Plaintiff various medications including Norco, Oxycodone, Valium, Trazadone, and Topamax (or Neurontin or Gabapentin). Riber Video Deposition; Exhibit 1 to Bergmann Video Depo. Dr. Riber opines that Plaintiff will require the medications prescribed by him for the foreseeable future. Riber Video Deposition.

18. Dr. Riber further testified that there is no indication that she is embellishing her pain. Riber Video Deposition. The Court accepts the conclusions of Dr. Riber and finds them persuasive. See infra, p. 22, pps. 12-16.

19. Dr. Riber referred Plaintiff to Dr. Larry Bergmann initially for him to offer an opinion concerning Plaintiff's suitability for a spinal cord stimulator trial. Bergmann Video Depo. Later, Dr. Riber actually referred her to Dr. Bergmann for counseling. Id. Dr. Bergmann diagnosed Plaintiff with major depressive disorder noting she expressed psychological symptoms from her chronic pain and the physical limitations and lifestyle changes that the pain has caused her, including anxiety, depression, and sleep disruption. Id. He opines to a reasonable degree of medical certainty that the most probable cause of Plaintiff's major

depressive disorder is the losses and continued pain and physical limitations associated with her injury.  Id.  His treatment plan for her included psychotherapy, focused on helping her reduce stressors and manage her pain, as well as a referral to a psychiatrist, Dr. Roger Deal, for medication management.  Id.  Dr. Bergmann's testimony is persuasive, especially when considered in conjunction with the testimony of Dr. Riber.

20.  Starting on March 31, 2009, when Dr. Bergmann began a doctor-patient relationship with Plaintiff, he saw her approximately 11 times in an eight month period.  Bergmann Video Depo.; and Exhibit 1 to the Deposition.   Then he did not see her for approximately four months.  Id.  She resumed visits in late March of 2010, with a visit in March, April, May, and July.  Id.  Thereafter, there was a seven month gap between visits, and then two (or possibly) three visits total in 2011.[3]  Id.

21.  Although Dr. Bergmann could not opine that Plaintiff's diagnosis of major depression was chronic, he did opine that he could not state to a reasonable degree of medical certainty when her symptoms would end.  Bergmann Video Depo.

22.  Dr. Robert Turner (and Dr. Joslyn Angus) also referred Plaintiff for physical therapy.  Lowe Deposition.   A functional capacity evaluation was performed by Philip Lowe, a licensed physical therapist.  Id.   He determined that Plaintiff could perform jobs with a light physical

---

[3]Exhibit 1 to Dr. Bergmann's deposition includes a summary of charges and credits.  This document notes two charges for February 15, 2011, and then a charge for July 21, 2011 and July 27, 2011.  However, Dr. Bergmann's progress notes only document the February 15, 2011 and July 27, 2011 visit. This may be a typographical error as to the dates on the charges and credit entry (which seems to be the most likely scenario as Dr. Deal's progress notes also reflect a July 27, 2011 visit, and there does not appear to be any documentation of a July 21, 2011 visit), or may possibly reflect a "phone visit" that Plaintiff recalled having.  Whichever the case, the Court's analysis and conclusions as set forth herein would remain unchanged.

demand level.  Id.  His evaluation was based on limited testing.  He was uncertain in his conclusions regarding the capacity of the Plaintiff to work.  He stated "light [work] is the maximum she would be able to tolerate . . .once you get down into the sedentary lights and the sedentary jobs, they get fewer and fewer . . .[I] try to encourage them to their maximum level. But until they try it, you don't know."  Lowe Deposition, p. 25, lines 15-21.

### D.   Medical History

23.   In February of 1999, Plaintiff injured her back and shoulder in a work related accident during employment with Foldcraft Co. in Minnesota.  Def. Ex. 38, p. 9.

24.   In 1999, Plaintiff reported having headaches in a visit to Dr. Hergott.  Defendant's Ex. 38, pps. 59-60.  However, Plaintiff offered testimony in this case that she had not suffered headaches prior the October 12, 2006 accident, in direct contradiction to earlier medical records.  C. Juaire Depo. and Trial Test.

25.   In April of 2000, Plaintiff was involved in an automobile accident, in which she  suffered injuries to her ankle and neck.  C. Juaire Trial Test.

26.   Beginning in November of 2001, Plaintiff had a doctor patient relationship with Dr. Harry S. Allen, Board Certified in Internal Medicine.  Dr. Harry Allen Video Depo.  Plaintiff saw him off and on for various ailments over a period of years.  Id.  Notably, her records during that time period reflect a fall from a horse in April of 2002.  Id.  Additionally, she saw Dr. Allen on August 8, 2006, shortly before the October 12, 2006 incident, complaining of numbness in her right hand associated with some discomfort in her right arm and shoulder.  Id.  A subsequent MRI was essentially normal.  Dr. Allen indicates that during the period of

time he treated her, he would describe her state of health as "generally good." Id. Dr. Allen did repeatedly encourage Plaintiff to stop smoking. Id.

27. After the accident at the Department of Transportation, Plaintiff was in another car accident in 2009 where she suffered injuries.

28. Plaintiff also had a knee injury from falling in her driveway post the October 12, 2006 incident.

**E.** **Defense Expert Testimony**

29. Dr. Paul Pritchard, an expert in Neurology, opined that Plaintiff suffers from a carpal tunnel syndrome, but that the carpal tunnel syndrome preexisted the October 12, 2006 accident. Pritchard Trial Test. Regarding the October 12, 2006 accident, he opined Plaintiff sustained a soft tissue injury, and that there was no neurological injury (which would encompass the brain, spinal cord, the spinal nerve roots, and the peripheral nerves). Id.

30. Dr. Nortin Hadler, an expert in rheumatology, agreed that Plaintiff has chronic wide-spread pain. Hadler Trial Test. However, he opines that the October 12, 2006 incident is not the proximate cause of Plaintiff's persistent wide spread pain, but instead that the incident was a minor event in a life course illness narrative and not the proximate cause. Id. He also opines that the recommendation to undergo the trial of the spinal stimulator was medically unnecessary, and that a recommendation to have the stimulator permanently implanted would fall below his standard of care. Id.

31. Dr. Mark Wagner, Ph.D., an expert in neuropsychology, offered a number of opinions. He opined that Plaintiff has a pain disorder associated with both psychologic factors and a general medical condition. Wagner Video Depo. He also gave a second diagnosis of a situational depression that is largely in remission. Id. His third diagnosis was a low average

intellectual function.  Id.  He opines that at the time of his exam, Plaintiff was not suffering from post traumatic stress syndrome, that he did not feel like she had any loss of cognitive function, and that he did not feel there was credible evidence to support memory loss.  Id. As to Plaintiff's physical capacity to work,  he opined that from a cognitive perspective, that he did not feel that there was any reason to contraindicate her working.  Id.  From a physical perspective, he noted that she had chronic pain issues, but that in doing the testing she had spent about four and a half to five hours of the equivalent of white collar work which she was able to complete.  Id.  He opined that she was malingering a memory disorder, or that she was not giving adequate effort on the test that was administered.  Id.  While, he did not believe that she was malingering a pain disorder, he did believe that there was symptom magnification.  Id.  Dr. Wagner's testimony is not significantly persuasive in light of the Court's conclusion that the Plaintiff was struck by the mail truck mirror, and the Court's finding thing that Dr. Riber's testimony is persuasive.

**F.**      **Vocational Prospects**

32.     J. Adger Brown, an expert in the area of vocational rehabilitation, opined that Plaintiff is not physically capable of performing any type of work on a sustained basis.  Brown Trial Test. and Report, Plaintiff's substituted Ex. # 48 .  His conclusions are set forth in detail in his report.  He opined that Plaintiff would be at great risk for failing in any type of return-to-work effort.  Id. He explained that Ms. Juaire's reported levels of pain, despite taking narcotic medication, would disincline an employer to hire her.  Id.  The Court finds this testimony persuasive.

33.     Mr. Brown further explained that he considered a functional capacity evaluation (hereinafter "FCE") completed in December 2009, but disagreed with its conclusion as he thinks the data

collected supports the idea that Plaintiff is capable of performing light activity, but that is not synonomous with light work. Brown Trial Test. and Report, Plaintiff's substituted Ex. # 48. In his Report, Mr. Brown indicates that "[a]though, [the FCE] indicates that [Plaintiff] may be capable of working at the full range of light duty, some internal inconsistencies in the FCE and comments made by the evaluator draw into question whether or not [Plaintiff] would actually be able to work in any job on a sustained basis, indicating that the FCE might actually be a better indication of her one-time maximum functional ability rather than her sustained work capacity." Id. He states, pending certain information from Dr. Bergmann regarding psychological impairment, "it is my opinion that this lady is not work-ready and should be considered totally disabled." Id.

**G.** **Surveillance**

34.    Surveillance was conducted of Plaintiff's daily activities. Damery, Bint, and Johnson Depos. R. Damery, who at the time worked for the Postal Service, Office of Inspector General, assisted in doing surveillance and investigations on workers' compensation cases. Damery Depo. He was contacted about doing surveillance on Plaintiff. Id. He conducted surveillance on February 25, 2011, and observed Plaintiff driving into Florence, going through a fast food drive through, and driving to her husband's place of employment. Id. She exited the vehicle and went inside the place of employment. Id. Upon returning to her vehicle, she left and pulled into a gas station and then returned to her residence. Id. This activity was also observed by Anita Bint, who also was contracted to observe Plaintiff's activities. Bint Depo. Stanley Johnson, special agent with the United States Postal Service Office of the Inspector General performed surveillance on Plaintiff on March 16, 2011, but observed no activity. Johnson Depo.

12

**H.**     **Past Work History**[4]

35.     Plaintiff was a member of the US Army National Guard between approximately 1980 and 1984, joining right out of high school.  Brown Report, Plaintiff's substituted Ex. # 48.

36.     Her next reported employment is as an EMT in Kansas, where she worked for approximately 5 years.  C. Juaire Trial test.

37.     Between approximately 1997 and 1998, Plaintiff worked for Pinedale Roundup, a newspaper in Wyoming as a staff photographer and dark room technician.  Brown Report, Plaintiff's substituted Ex. # 48; C. Juaire Trial test.

38.     Between approximately 1998 and 1999, Plaintiff also worked as a forklift operator at Foldcraft Co. in Minnesota. Defendant's Exhibit 38, p. 1; Brown Report, Plaintiff's substituted Ex. # 48; C. Juaire Trial Test.  During this employment, Plaintiff had a Worker's Compensation claim where she suffered a back/shoulder injury for which she received 14 weeks of temporary disability.  C.  Juaire Trial Test.  Plaintiff did not initially recall this Worker's Compensation claim and denied having a previous claim at her deposition.  Id.

39.     Between 1999 and 2003, Plaintiff worked at a call center for Rust Consulting Company in Minnesota which handles class action lawsuit administration work.  Def. Ex # 38, p.11, Brown Report, Plaintiff's substituted Ex. # 48; C. Juaire Depo and Trial Test.

**I.**     **Pain and Loss of Enjoyment of Life**

40.     Plaintiff estimated her daily pain before the stimulator implant at 8/10 and now rates it at 5-6/10. C. Juaire Depo.  Plaintiff indicates that she cannot do activities she previously enjoyed, including: cleaning house, riding motorcycles, and riding horses.  She now cries more and

---

[4]The dates noted in the past work history are often approximate, as most of these dates are based on the recollections of Plaintiff, oftentimes without specific documentation in the record.

cannot sleep, work, clean house, or do yard chores like she used to do. C. Juaire Depo. and Trial Test.; A. Juaire Trial Test. However, she is apparently able to do laundry, keep the floor swept, and do certain things to take care of her dogs, i.e.: make up the couch for them, straighten their blankets, feed them, bathe them, and let them out. A. Juaire Trial Test. The pain has also affected Plaintiff's relationship with her husband because the two cannot do things together as they once did. C. Juaire Depo. and Trial Test; A. Juaire, Trial Test. However, they are able to go to the movies and go out to eat. A. Juaire Trial Test.

41.     At the time of the accident, Plaintiff was 45 years old, with a life expectancy of 37.29 years according to S.C. Code §19-1-150. At the time of trial, Plaintiff is 49 years of age and has a projected life expectancy of 32.69 years according to S.C. Code §19-1-150.[5]

**J.      The Damages**[6]

42.     An itemization of the medical expenses that Ms. Juaire has incurred to date include (See Plaintiff's Ex. # 31):

    a.      Dewey N. Ervin, M.D.
            Rakesh P. Chokshi, M.D.
            Pee Dee Orthopaedic Associates, P.A.
            901 East Cheves Street, Suite 100
            Florence, South Carolina 29506                 $3,071.94

    b.      Shannon Ardis, MPT

---

[5]Plaintiff's date of birth is October 8, 1961. Woods Trial Test. At the time of trial, she was 1 month shy of her 50th birthday. According to S.C. Code Ann. 19-1-150, in determining the age of a person as of any particular time, periods of six months or more beyond the last full year must be treated as one year in using the table therein.

[6]The Court notes that the Government focused its defense primarily on the issue of liability. The damages which Plaintiff asserted and offered evidence of by way of *inter alia*, the Westman life plan and the economic loss study by Dr. Woods are essentially uncontradicted by the Government. The Government produced little, if any, evidence such as economic testimony or projections to refute the calculations and damages asserted by Plaintiff.

Kevin Hatchell, MHS
Three Rivers Therapy Associates
401 Second Loop Road, Suite A
Florence, South Carolina   29505          955.00

c.  McLeod Regional Medical Center
    Department of Radiology
    555 East Cheves Street
    Florence, South Carolina 29501        6,481.00

d.  Pee Dee Radiology Group, P.A.
    Post Office Box 1690
    Florence, South Carolina 29503          389.00

e.  Edwin Gandy, M.D.
    Carolinas Hospital System
    Post Office Box 100550
    Florence, South Carolina 29501          564.43

f.  Florence MRI & Imaging
    805 South Irby Street
    Florence, South Carolina 29501        1,161.00

g.  Lucian Weatherford, M.D.
    Carolinas Hospital System
    Occupational Health Center
    1954 Freedom Boulevard, Suite 101
    Florence, South Carolina 29505          707.05

h.  Ezra B. Riber, M.D.
    Palmetto Pain Management, LLC
    2601 Laurel Street, Suite 130
    Columbia, South Carolina 29204        19,623.01

I.  William B. Naso, M.D.
    Florence Neurosurgery & Spine, P.C.
    1204 East Cheves Street
    Florence, South Carolina 29506          460.00

j.  Joslyn L. Angus, Jr., M.D.
    Jeter & Skinner Family Practice, P.A.
    McLeod Medical Park West
    305 East Cheves Street, Suite 160
    Florence, South Carolina 29506          472.00

k.  InMed Diagnostic Services of S.C., LLC
    126 South Assembly Street
    Columbia, South Carolina 29201                    1,568.00

l.  Florence Radiological Associates, P.A.
    Post Office Box 1690
    Florence, South Carolina 29501                     948.00

m.  Carla Benton, P.T.
    Health South Rehabilitation Hospital
    900 East Cheves Street
    Florence, South Carolina 29506                     615.00

n.  Carolinas Medical Alliance
    947 South Irby Street
    Florence, South Carolina 29501                     330.00

o.  W. Dean Lorenz, M.D.
    Florence Rehabilitation Medicine
    1925 Hoffmeyer Road
    Florence, South Carolina 29501                     185.00

p.  Phillip Lowe, RPT
    Lowe's Physical Therapy
    507 West Cheves Street
    Florence, South Carolina 29501                   4,100.00

q.  Eckerd Pharmacy
    1825 West Palmetto Street
    Florence, South Carolina 29501                   2,432.29

r.  Larry Bergmann, M.D.
    Post Trauma Resources
    1709 Laurel Street
    Columbia, South Carolina 29201                   4,446.00

s.  McLeod Regional Medical Center
    555 East Cheves Street
    Florence, South Carolina 29501                  88,870.00

t.  CVS (Revco) Pharmacy
    3306 West Palmetto Street
    Florence, South Carolina 29501                   5,660.16

u.  Linear Medical Solutions, Inc.
    3333 Hendricks Avenue
    Jacksonville, FL 32207                    20,355.61

        TOTAL                         $163,394.49

43.  Ms. Linda Westman, an expert in life care planning, submitted a life-care plan for Plaintiff

     showing an analysis of future medical and therapeutic costs.  Westman Trial Test.  Her plan

     included the following categories: pain management, psychiatry, physical therapy,

     psychological counseling, neurostimulator programming, neurostimulator replacement

     (hospital fees), neurostimulator replacement (physician and anesthesia fees),

     neuorostimulator programmer replacement, pre operative work-up (EKG, labs), and

     medications.  Westman Trial Test. and Exhibit 47.[7]

44.  Ms. Westman does note that although she includes it in her life care plan, no physician has

     prescribed further physical therapy.  Westman Trial Test.; Exhibit 47.

45.  Ms. Westman also notes that although she includes 6 sessions a year for psychological

     counseling, she understands that there has been some variation in terms of the frequency of

     those sessions being utilized by Plaintiff.  Westman Trial Test.; Exhibit 47.

46.  Dr. Oliver Wood, an expert in the evaluation of economic loss in personal injury cases,

     prepared a calculation of losses to date and a projection of future losses.  Wood Trial Test.

     In preparing his study of economic loss in this case, Dr. Wood considered a number of facts,

     and was provided certain information including the following: (1) according to Plaintiff, she

     had no reason to expect less than a normal life expectancy and she intended to work until age

     67 (which would be her normal Social Security retirement age); (2) according to Plaintiff's

---

[7]The Court notes there are two Plaintiff's Exhibit # 47 in the record.  The first is dated
August 26, 2011. The second is an updated report dated September 6, 2011.

personnel records at the time of her injury, her annual salary was $19,091.00, and effective December 2, 2006, her salary would have increased to $20,085.00; (3) as an employee of the Department of Transportation, she was a member of the South Carolina retirement system, and being a member, she had to contribute six and a half percent of her income to the retirement fund; and (4) as an employee of the Department of Transportation, she was provided health and dental insurance for herself and her dependents through the state health plan. Id. With respect to family services, Dr. Wood indicated that Plaintiff approximated that before her injury she performed an average of 28 hours a week of these services including personal services, such as cooking, washing dishes, laundry, vacuuming, general household cleaning, grocery shopping, and lawn and yard care. Id. Plaintiff indicated to Dr. Wood that for approximately eight months after she was injured she was not able to do any of these services; but that since approximately June 13, 2007, she does about eight hours a week, creating a net loss of 20 hours per week. Id. Dr. Wood also considered the life care plan prepared by Ms. Linda Westman. Id.

47. Dr. Wood prepared a number of charts which are included in Plaintiff's substituted Exhibit 46. The first chart looks at the before trial loss meaning from October 13, 2006 through September 7, 2011, which is a period of 4.91 years. Plaintiff's substituted Exhibit 46. He determined Plaintiff's pre-trial net loss of earning capacity to be $95,115.00. Id. He determines her net pre-trial loss of personal services to be $39,936.00. Id. Accordingly, he concludes that her before trial loss is the sum of $95,115.00 and $39,936.00, for a total of $135,051.00. Id.

48.     Chart two looks at the present value of Plaintiff's after trial loss in earning capacity through age 67. Her loss in earning capacity discounted to present cash value is $ 281,619.00. Plaintiff's substituted Exhibit 46.

49.     Chart three looks at the Consumer Price Index for medical care items in the United States. Plaintiff's substituted Exhibit 46. Chart four shows the annual compounded growth rates for the General Consumer Price Index, General Medical Consumer Price Index, and Selected Medical Care Items. Id.

50.     Chart five is the life care plan prepared by Ms. Westman. Plaintiff's substituted Exhibit 46.

51.     Chart six looks at the present value of the future medical care costs (as outlined in the life care plan) which is calculated at $329,400.00. Plaintiff's substituted Exhibit 46.

52.     Chart seven looks at the present value of the after-trial loss, which totals to $980,585.00 Plaintiff's substituted Exhibit 46.

53.     Chart eight is the sum of the before trial loss of $135,051.00 and the after-trial loss of $980,585.00 totaling $1,115,635.00. Plaintiff's substituted Exhibit 46.

54.     The Government did not offer any testimony from an expert in the evaluation of economic loss.

## CONCLUSIONS OF LAW

## A.     Federal Tort Claims Act

1.     This case was brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq. and 28 U.S.C. § 1346(b). Mr. Donald Singletary (hereinafter "Singletary") was operating a motor vehicle within the course and scope of his federal employment at the time of the collision on October 12, 2006. Answer, ¶ 4. Ms. Christiana Juaire filed a Complaint against the United States of America on March 19, 2009. She satisfied the administrative requirements of the

Federal Tort Claims Act, and this Court has jurisdiction over this matter. Complaint, ¶ 5; Answer ¶ 5. Under the Federal Tort Claims Act, the United States is liable to a tort claimant to the same extent that a private person would be liable according to the law of the state of the occurrence. 28 U.S.C. § 1346(b) and § 2674. South Carolina law thus governs the determination of liability and damages.

**B.**     **Negligence**

2.     To prevail on a negligence claim in South Carolina, a plaintiff must show that the (1) defendant owed a duty of care to the plaintiff, (2) defendant breached the duty by a negligent act or omission, (3) defendant's breach was the actual and proximate cause of the plaintiff's injury, and (4) plaintiff suffered injury or damages. Jackson v. Swordfish Invs., L.L.C., 365 S.C. 608, 620 S.E.2d 54 (2005).

**C.**     **Duty and Breach**

3.     There are a number of statutory and common law duties which may be relevant to the facts of this case.

4.     A duty is imposed on persons using highways to exercise ordinary care to avoid injuries to themselves and others. See Epps v. South Carolina State Highway Dep't, 209 S.C. 125, 39 S.E.2d 198 (1946).

5.     A person operating a motor vehicle on a public highway owes an urgent duty to keep a proper lookout and keep the vehicle under proper control, so as to be able to slow down, stop or turn such vehicle in order to avoid hazards such as colliding with other vehicles, pedestrians, and obstructions lawfully on the road. See generally, Johnson v. Horry County Solid Waste Authority, 389 S.C. 528, 698 S.E.2d 835 (S.C. App. 2010).

6.	A person using the public roadways of this state owes a duty to exercise ordinary care at all time to avoid an accident.  See generally,  Johnson v. Horry County Solid Waste Authority, 389 S.C. 528, 698 S.E.2d 835 (S.C. App. 2010).

7.	South Carolina Code § 56-5-1536 describes a temporary work zone as a "special hazard"and provides that:

> The driver of a vehicle shall keep his vehicle under control when approaching or passing a temporary work zone area. The exercise of control required for a driver to comply with this section is that control possible and necessary by the driver to avoid a collision, and to avoid injury to persons or property.

8.	South Carolina Code § 56-5-1895 provides:

> No vehicle may be driven so as to overtake and pass another vehicle in a highway work zone where road maintenance or construction work is underway and passing would be hazardous to the highway worker.

9.	A breach of duty exists when it is foreseeable that one's conduct may likely injure the person to whom the duty is owed. Horne v. Beason, 285 S.C. 518, 331 S.E.2d 342 (1985).

10.	A violation of applicable motorists' statutes is negligence per se. Field v. Gregory, 230 S.C. 39, 94 S.E.2d 15 (1956).

11.	The Court concludes that Plaintiff has established a duty owed to her under the statutory and common law by Singletary as an operator of an automobile.  Plaintiff has also shown a breach of the owed duty by negligence per se for violation of South Carolina's statutory duties of motorists driving in a work zone and/or by showing the breach of at least one of the common law duties to exercise ordinary care in using the highways as set forth above.  The Court concludes that Singletary was solely responsible for the conduct causing the Plaintiff to be struck by the truck mirror, and no affirmative defense of comparative negligence has been shown.

21

**D.** **Proximate Cause**

12.     The South Carolina Court of Appeals has indicated that "[i]t is apodictic that a plaintiff may only recover for injuries proximately caused by the defendant's [conduct.]" <u>Mellen v. Lane</u>, 377 S.C. 261, 659 S.E.2d 236  (S.C. Ct. App. 2008).   A plaintiff in a negligence action is entitled to recover all damages proximately resulting from a defendant's negligent acts, including the aggravation of pre-existing conditions. <u>Watson v. Wilkinson Trucking Co.</u>, 244 S.C. 217, 136 S.E.2d 286 (1964).  Proximate cause is established by proof of actual and legal causation.  <u>Hill v. York County Sheriff's Dep't</u>, 313 S.C. 303, 308, 437 S.E.2d 179, 182 (1993). Actual causation is proved by establishing the injury would not have occurred but for the defendant's negligence, while legal causation is proved by establishing foreseeability. <u>Id</u>.  <u>See also</u>,  <u>Bramlette v. Charter-Medical-Columbia</u>, 302 S.C. 68, 393 S.E.2d 914 (1990). Although foreseeability of some injury from an act or omission is a prerequisite to establishing proximate cause, the plaintiff need not prove that the actor should have contemplated the particular event which occurred: the defendant may be held liable for anything which appears to have been a natural and probable consequence of his negligence. <u>Bramlette v. Charter-Medical-Columbia</u>, 302 S.C. 68, 393 S.E.2d 914 (1990).  A plaintiff therefore proves legal cause by establishing that the injury in question occurred as a natural and probable consequence of the defendant's negligence. <u>Id</u>.  Proximate cause does not mean the sole cause; the defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury. <u>Small v. Pioneer Mach., Inc.</u>, 329 S.C. 448, 494 S.E.2d 835 (S.C. Ct.App.1997).

13.     With regards to the issue of proximate cause, the Court has considered the testimony of the treating physicians, as well as the Defendant's expert witnesses who have examined and/or

22

evaluated Plaintiff and/or her medical records. The Court is sufficiently persuaded by, and concludes from the treating physician's opinions and testimony, that Singletary's negligent conduct was a proximate cause of Plaintiff's current condition.

14.     Clearly, proximate cause is a significant, if not the controlling, issue in this case. Both Dr. Riber's testimony and Dr. Hadler's testimony have been carefully considered. Both are qualified experts in this case who provide evidence related to proximate cause. In his testimony Dr. Riber stated that ". . .[t]hese joints here, these paired joints are the facet joints and they allow the spine to move in various ways. But when they are suddenly asked to move in a way that they are not used to, which could be from a sudden trauma, could be from a car accident, could be–or from repetitive motion sometimes, but very commonly just a – a sudden trauma, these joints will get injured. And there's a little nerve off this main spinal nerve to each of these joints and often times create a pain syndrome from that. . . .It's a diagnosis of – it's what we call a clinical diagnosis based on the way somebody gets hurt." Riber Video deposition, pps12-13. When asked what caused the facet syndrome injury, Dr. Riber stated "[d]ue to the trauma she [Plaintiff] sustained when she was injured, being struck by the mirror -- in her back." Id. at p. 14. Riber further testified the facet pain syndrome is permanent and that the plaintiff was not embellishing or exaggerating her pain and that she was not malingering. Id. at pps. 23, 26, and 27. He further states he believed her complaints of pain were genuine and that the causes of her injuries were the result of being struck on October 12, 2006, the date of the accident. Id. at p. 27.

15.     Dr. Hadler testified regarding the relationship between the "particular incident to her illness course." Hadler Trial Test. He noted the Plaintiff "continued working and appeared at the emergency department that evening." Id. He was struck with the fact that the only findings

on physical examination were some tenderness, and that objectively in terms of radiographic studies and range of motion, she was a well woman. Id. He further noted she "did not suffer any violent physical trauma . . or anatomical injury otherwise." Id. Hadler does acknowledge that he agrees that blunt trauma to the mid-back and left shoulder produces the complaints by Plaintiff to the emergency room physician and that there is a "causal connection" between the two. Id. Hadler further states that Plaintiff is "faced with a major illness. If you want our suspicions, and its very hard to demonstrate this, although we are coming closer and closer, a tort procedure is what we call social iatrogenesis." Id. He states the Plaintiff has "persistent widespread pain" but that he doesn't "think [the accident is] the proximate cause of persistent widespread pain in Ms. Juaire." Id. Dr. Hadler concludes that the Plaintiff was "catastrophizing" her condition. He believes the spinal cord stimulator implant was "medically unnecessary" and that the emergency room records did not show "major damage to her tissue....the event should have been a minor experience . . .a minor event." He does state being struck by a mirror on a moving vehicle "would hurt."

16. This Court has to decide which testimony is persuasive. Both Dr. Riber and Dr. Hadler are qualified experts in the field of medicine. Both provided extensive testimony. The Court finds the testimony of Dr. Riber more persuasive than that of Dr. Hadler. Dr. Riber was the hands on, treating physician in this case. He explained in detail the injury that would more likely than not be caused to the Plaintiff as a result of being struck by the mail truck mirror. He followed a number of progressive steps in reaching his conclusion that the Plaintiff suffered significant injury as a result of being struck, and followed progressive treatment leading to the stimulator implant after other options were pursued without success. Dr. Riber concludes that the Plaintiff suffered serious injury as a result of being struck, was in pain, and

not malingering.  Dr. Hadler was offered as an expert by the Government.  Although he did not actually treat Plaintiff, he carefully reviewed the medical records generated in this case and explained his conclusions in detail.  He has a distinguished background.  However, after careful evaluation, the Court finds, for the reasons stated, the testimony of Dr. Riber more persuasive and concludes the Plaintiff's injuries were proximately caused as a result of being struck by the mail truck mirror on October 12, 2006.

**E.**    **Damages**[8]

17.    An injured party is entitled to recover all damages, present and prospective, which are naturally a proximate consequence of the wrongful act.  Watson v. Wilkinson Trucking Co., 244 S.C. 217 (1964); See generally, Smith v. Wells, 258 S.C. 316, 319, 188 S.E.2d 470, 471 (1972). In a personal injury action, a plaintiff can recover for the necessary and reasonable [medical] expenses caused by the injury such as amounts necessarily paid for medicine, medical attendance, hospital expense and care and nursing.  Sossamon v. Nationwide Mut. Ins. Co., 243 S.C. 552, 135 S.E.2d 87 (1964).

18.    Having concluded that Plaintiff was struck in the mid back region by the driver's left side mirror, and that this was the proximate cause of the injuries suffered by Plaintiff, the Court concludes that Plaintiff is entitled to recover damages in the amount of $ 163,394.49 for past medical care and treatment.  This figure is based on the itemization of damages submitted and placed into evidence at trial.  C. Juaire Trial Test.; See Plaintiff's Ex. # 31, and paragraph 42, supra.  The Government did not offer evidence which would persuade the

---

[8]The Court notes that it finds that Plaintiff has proven by a preponderance of the evidence that she is entitled to the enumerated damages in the amounts specified herein.

Court that these expenses were not incurred, or that they were not necessary and reasonable medical expenses.

19.     With regards to her medical expenses, a plaintiff may also recover any future damages resulting from permanent injury. Watson v. Wilkinson Trucking Co., 244 S.C. 217, 136 S.E.2d 286 (1964). To recover for future consequences of an injury, the evidence must establish to a reasonable certainty that the future consequences will actually occur. Haltiwanger v. Barr, 258 S.C. 27, 32, 186 S.E.2d 819, 821 (1972). Any award of future medical expenses must also be based upon something more than mere speculation. See generally, Kelly v. Brazell, 253 S.C. 564, 172 S.E.2d 304 (1970). In proving future medical expenses, the value of such care may often be established through expert medical testimony. See generally, Pearson v. Bridges 337 S.C. 524, 524 S.E.2d 108 (S.C. App. 1999). The Court concludes from the treating physician's testimony that Plaintiff has reached maximum medical improvement, that her condition is permanent, and that she will require certain portions of the medical care summarized in the Westman life care plan. Based in part on the decreased frequency of Plaintiff's attendance for appointments with Dr. Bergmann, the Court does not find that the psychological counseling listed in the life care plan prepared by Ms. Westman, and valued at $21,077.00 by Dr. Wood, is a necessary, non-speculative medical expense. Additionally, as no physician has ordered any further physical therapy, the Court finds the one time amount for physical therapy listed in the life care plan prepared by Ms. Westman, and valued at $ 142.00 by Dr. Wood is an amount not appropriately awarded. Subtracting these amounts, and finding the remaining items listed in the life care plan prepared by Ms. Westman to be appropriate, the Court concludes that the present day value of Plaintiff's future medical costs as valued by Dr. Wood is $308,181.00. Accordingly, the

Court awards Plaintiff damages in the amount of $ 308,181.00 for total future medical costs. The Government did not offer any significant contradictory evidence which would persuade the Court that these expenses would not likely be incurred, nor that they were speculative in nature. The Court notes that with the exception of the physical therapy and psychological counseling sessions which the Court has not allowed, the Government did not offer any significant evidence to contradict the life care plan presented by Ms. Westman, or the economic calculations done by Dr. Wood.

20. A plaintiff may recover lost wages and loss of future earnings and earning power. See generally, Watson v. Wilkinson Trucking Co., 244 S.C. 217, 136 S.E.2d 286 (1964). The Court concludes, relying in large part on the trial testimony of J. Adger Brown (Plaintiff's vocational rehabilitation expert) and his Report, that Plaintiff is unable to maintain any type of work on a sustained basis, and that accordingly, she is entitled to her lost wages and future earnings. As previously noted, the Court finds the testimony of Brown persuasive. Discounted to present value, the sum of these losses for pre-trial lost wages ($95,115.00) and future earnings (reduced to present value $ 326,138.00[9]) is $ 421,253.00.

21. The Court also concludes that Plaintiff is entitled to damages for future loss of health insurance ($161,079.00) and dental insurance ($2,023.00) for a total amount of lost benefits in the amount of $163,102.00.

22. Plaintiff has also requested damages for the loss of personal services. After careful review and consideration of the record, and in light of the Court's evaluation of the credibility of

---

[9]This amount represents the present value of Plaintiff's after trial loss in earning capacity ($281,619.00) less contributions to the Retirement System at 6.5% ($18,305.00) plus Retirement Income ($ 62,824.00).

Plaintiff's testimony regarding the personal services that she was performing previously and the number of hours she is able to perform now, the Court concludes that Plaintiff is entitled to damages for past loss of personal services up to the date of trial in the amount of $4430.00. This consists of approximately 34 weeks immediately subsequent to the accident, where the Court determines that 4 hours per week of personal services is warranted. Thereafter, the Court finds that 2 hours per week in personal services is appropriate.[10] The Court determines an award, reduced to present value, of $16,348.77 is appropriate for future loss of personal services from the date of trial. This represents damages for approximately 2 hours per week in personal services for the duration of Plaintiff's life expectancy(based on S.C. Code Ann. §19-1-150). Accordingly, The Court awards a total of $20,778.77 for the past and future loss of personal services.

23.    Pain and suffering has long been recognized by South Carolina courts to be a compensable element of damages. See Harper v. Bolton, 239 S.C. 541, 124 S.E.2d 54 (1962). Pain and suffering have no market price. Id. They are not capable of being exactly and accurately determined, and there is no fixed rule or standard whereby damages for them can be measured. Id. The Court may include such damage for physical pain and suffering as it is reasonably certain will result in the future from the injury. Campbell v. Hall, 210 S.C. 423, 430-31, 43 S.E.2d 129, 132 (1947). Similarly, mental pain and suffering is an element of compensatory damages. Shuler v. Heitley, 209 S.C. 198, 202, 39 S.E.2d 360, 361 (1946); see Mims v. Florence Cnty. Ambulance Serv. Comm'n, 296 S.C. 4, 7, 370 S.E.2d 96, 99

---

[10]Consistent with the testimony of Dr. Wood, the loss of personal services in 2006 and 2007 was evaluated at $7.00 per hour. Thereafter up to the date of trial, it was evaluated at $8.00 per hour.

(Ct.App.1988) (damages may be awarded for physical pain and suffering and for mental pain and suffering).

24.     After careful review and consideration of the record, and in light of the Court's evaluation of the credibility of Plaintiff's complaints of pain, the Court concludes that Plaintiff is entitled to damages for past and future pain and suffering directly resulting from Singletary's negligent actions in a total amount of $ 140,615.00. This consists of $ 15.00 per day for the 753 days post-accident, but pre-stimulator surgery (totaling $11,295.00) and $ 10.00 per day for the 12,932 days of her projected life expectancy from the date of the stimulator surgery[11] (totaling $ 129,320.00) for a total award of past and future physical and mental pain and suffering of $ 140,615.00. The Court finds significant that Plaintiff's pain is managed well by the spinal cord stimulator and prescribed medications.

25.     Loss of enjoyment of life is a separate and distinct element of damages. Boan v. Blackwell, 343 S.C. 498, 501, 541 S.E.2d 242, 244 (2001). "[D]amages for loss of enjoyment of life compensate for the limitations, resulting from the defendant's negligence, on the injured person's ability to participate in and derive pleasure from the normal activities of daily life, or for the individual's inability to pursue his talents, recreational interests, hobbies, or avocations." Id. at 502. These damages compensate the individual not only for the subjective knowledge that one can no longer enjoy all of life's pursuits, but also for the objective loss of the ability to engage in these activities. Id. The Court finds that there is unrebutted evidence in the record that Plaintiff can no longer enjoy many of the activities that she enjoyed prior to the collision. After careful review and consideration of the record, and in

_____

[11]On the date of the stimulator surgery, November 4, 2008, Plaintiff had a life expectancy of 35.43 years.

light of the Court's evaluation of the credibility of Plaintiff's statements relevant to the loss of enjoyment of life, the Court concludes that Plaintiff is entitled to damages for loss of enjoyment of life in a total amount of $ 68,055.00.  This consists of $ 5.00 per day from the date of the accident through Plaintiff's projected life expectancy.

**CONCLUSION**

Based on the foregoing, the Court finds and concludes that the United States of America is responsible and liable for the above stated damages suffered by Plaintiff.  After careful review and consideration, and in light of the Findings of Fact and Conclusions of Law outlined herein, the Court finds that a total damages award in favor of Plaintiff in the amount of $1,285,379.26[12] is appropriate.

Accordingly, **IT IS HEREBY ORDERED** that Judgment in the amount of $1,285,379.26 be entered for the Plaintiff as follows: $163,394.49 for past medical expenses and treatment; $308,181.00 for future medical costs; $ 421,253.00 for lost wages and future earnings; $ 163,102.00 for lost benefits; $ 20,778.77 for past and future loss of personal services; $ 140,615.00 for pain and suffering; and $ 68,055.00 for loss of enjoyment of life. The Clerk of Court is requested to enter Judgment for Plaintiff accordingly.

**IT IS SO ORDERED**.

s/ Terry L. Wooten<br>The Honorable Terry L. Wooten

February 16, 2012                      United States District Judge
Florence, South Carolina

---

[12]The Court has not offset the damages calculations by any Workers Compensation benefits that Plaintiff has received.  *See Dixon v. Besco Engineering, Inc.,* 320 S.C. 174, 463 S.E.2d 636 (Ct.App. 1995)(noting that the collateral source rule prevents a tortfeasor from receiving a reduction in damages due to payments or compensation received by the injured person from a source wholly independent of the tortfeasor including both gratuitous benefits and nongratuitous benefits arising from employment, insurance, or other contractual agreements; applying the collateral source to unemployment benefits); *Phillips v. United States*, 575 F.Supp. 1309, 1316 (D.S.C. 1983)(applying collateral source rule in a FTCA case).  The Plaintiff will have to comply with any requirements of repayment of the Worker's Compensation benefits received as provided under state law.